## 22027

The STATE, Respondent, v. John H. PLATH and John D. Arnold, Appellants.
(313 S. E. (2d) 619)

Supreme Court

4

*David I. Bruck*, Columbia; *Joseph R. Barker*, Hilton Head, and *Peter L. Fuge*, Beaufort; and *Asst. Appellate Defender William Isaac Diggs*, of *S. C. Commission of Appellate Defense*, Columbia; and *Ralph V. Baldwin, Jr.*, and *C. Scott Graber*, Beaufort, *for appellants.*

*Atty. Gen. T. Travis Medlock, Asst. Atty. Gen. Harold M. Coombs, Jr.*, and *Sr. Asst. Atty. Gen. Brian P. Gibbes*, Columbia, *for respondent.*

Heard Sept. 12, 1983.

Decided Jan. 17, 1984.

LEWIS, Chief Justice:

Upon a previous trial, appellants were convicted of murder and were sentenced to death, the jury having found that the

murder was perpetrated while in the commission of kidnapping. See Section 16-3-20(C)(a)(1)(c), Code of Laws of South Carolina, 1976. This Court affirmed the convictions but remanded the case for retrial as to sentence. *State v. Plath*, 277 S. C. 126, 284 S. E. (2d) 221. Appellants have again been sentenced to death: Arnold, upon a jury finding of kidnapping; Plath, upon jury findings of kidnapping and assault with intent to ravish. Section 16-3-20(C)(a)(1)(b) and (c), Code. We affirm the sentences.

Appellants claim that errors arose at four points in the trial: (1) in the disqualification of certain jurors; (2) in certain evidentiary rulings by the trial court; (3) in certain conduct of the Solicitor; and (4) in the submission of aggravating circumstances to the jury. Under each of these headings multiple exceptions are presented.

(1) *Disqualification of Jurors.*

It is contended that three specific jurors were excused in violation of the requirements established by *Witherspoon v. Illinois*, 391 U. S. 510, 88 S. Ct. 1770, 20 L. Ed. (2d) 776. The first of these jurors was questioned by defense counsel concerning his ability to "consider" the death penalty. This Court has repeatedly said that the test of a juror's qualification under 16-3-20(E), Code, is the ability to both reach a verdict of either guilt or innocence and to, if necessary, vote for a sentence of death. The ability to merely "consider" these possibilities is not sufficient to qualify a prospective juror. *State v. Tyner*, 273 S. C. 646, 651, 258 S. E. (2d) 559, 562; *State v. Goolsby*, 275 S. C. 110, 116, 268 S. E. (2d) 31, 35; *State v. Linder*, 276 S. C. 304, 313, 278 S. E. (2d) 335, 340; *State v. Hyman*, 276 S. C. 559, 563, 281 S. E. (2d) 209, 211-212; *State v. Owens*, 277 S. C. 189, 192, 284 S. E. (2d) 584, 586; *State v. Koon*, 278 S. C. 528, 532, 298 S. E. (2d) 769, 771; *State v. Copeland*, 278 S. C. 572, 579, 300 S. E. (2d) 63, 67, cert. denied, ____ U. S. ____ , 103 S. Ct. 1802, 76 L. Ed. (2d) 367.

This same juror was in due course asked the appropriate questions by the trial court —

Question: ... Would you vote for the death penalty —
Answer: No, sir.
Question: — and write your name?
Answer: No sir, no sir.

We find these responses fully warranted disqualification of the juror.

The next juror was a retired official of the United States government who appeared experienced, well informed and quite capable of articulating his beliefs. He stated flatly, "Your Honor, I feel as though I could not recommend death, whatever the circumstances." He was then asked, "it's your feeling that you could never bring in the death penalty?" To this he responded, "That is correct, sir." It is significant that no objection was made to dismissal of this juror and that, in fact, counsel for defendant Plath declined to question him, stating, "we are not going to waste his time." In like manner, the third juror was excused without objection after she repeatedly and emphatically stated she could not put a defendant to death.

We take note of the acquiescence by defense counsel because the context of these disqualifications is important. In this trial over one hundred prospective jurors were interviewed, each being questioned at great length and in depth on a wide range of topics. Subsequent to this trial, our Court announced two opinions emphasizing the authority and duty of trial judges to focus the scope of *voir dire* upon matters enumerated in Section 14-7-1020, Code, and to eliminate excessive intrusions upon the privacy of prospective jurors. *State v. Koon,* 278 S. C. 528, 532, 298 S. E. (2d) 769, 771; *State v. Smart,* 278 S. C. 515, 522-523, 299 S. E. (2d) 686, 690-691, cert. denied ____ U. S. ____ , 103 S. Ct. 1784, 76 L. Ed. (2d) 353.

These appellants were granted leave to examine jurors far above and beyond any constitutional and statutory entitlements. We note in passing that of the twelve members of the panel which actually served in this case, five members during voir dire expressed serious reservations about capital punishment and/or a preference for life imprisonment. Two others stressed the gravity of the decision they faced and expressed a very strong desire to base the decision upon complete and convincing evidence. We are impressed by the singular fairness and impartiality of this jury panel and are satisfied that the disqualifications of which the appellants complain were proper, in accordance with law, and in no way worked to their prejudice.

(2) *Evidentiary Rulings.*

Multiple errors are claimed under this heading: (a) introduction of each appellant's criminal record; (b) refusal to admit a tape cassette offered by appellant Plath; (c) reference on cross-examination to other death penalty trials; and (d) conduct of the jury visit to the scene of the crime.

(a) Appellant Arnold offered in mitigation the testimony of Dr. Peter Neidig, a clinical psychologist, who related his assessment of the defendant based upon personal interviews. On direct examination the witness disclosed what he had learned about Arnold's juvenile offenses. On cross-examination the State continued the inquiry and brought to light Arnold's adult offenses together with the fact that he was an escapee at the time he committed this murder. Defense objected to the inquiry, while admitting the "door" had been "opened" to it, and was properly overruled. The State is not required to accept, without cross-examination, a partial history such as was here presented by the defendant. *State v. Allen,* 266 S. C. 468, 484, 224 S. E. (2d) 881. Dr. Neidig himself stated that he had reviewed with Arnold the *entire* course of his criminal career. Thus the testimony of the witness was left incomplete and fragmentary by the defendant and was only made whole through subsequent inquiry by the State. We find no abuse of discretion in the trial court's ruling on this point.

The criminal record of appellant Plath came into evidence by a different route. At the original trial of this case, appellant Plath took the witness stand during the guilt phase and *on direct examination* revealed his own prior criminal record. He now complains that this same information, exactly as he volunteered it, was placed before the jury in the sentencing trial presently on appeal.

One of Plath's chief witnesses in mitigation was Officer Charles Robertson of the City Police Department in York, Pennsylvania. On direct examination, Officer Robertson testified in some detail concerning Plath's criminal record, all for the purpose of explaining how he came to know the defendant and in order to then discuss Plath's subsequent religious activities. Significantly, the State did not cross-examine this witness concerning appellant's record. We are at a loss to

understand how Plath can complain about the admission of his criminal record when the same information would have inevitably been introduced in the course of his own showing in mitigation.

This Court has given serious consideration to the complaints of both appellants because they reflect a profound misconception of the capital sentencing trial as such. Section 16-3-20(B), Code, governs original trials as to sentence: "In the sentencing proceeding, the jury or judge shall hear additional evidence in extenuation, mitigation or aggravation of the punishment." Section 16-3-25(E), Code, provides for retrial as to sentence, such as here occurred:

> In the resentencing proceeding, the new jury, if the defendant does not waive the right of a trial jury for the resentencing proceeding, shall hear evidence in extenuation, mitigation or aggravation of the punishment in addition to any evidence admitted in the defendant's first trial relating to guilt for the particular crime for which the defendant has been found guilty.

Information as to a defendant's record of previous criminal convictions has always been deemed relevant to the process of imposing sentence upon a plea or verdict of guilt. So fundamental is this proposition that it requires no citation of authority, but we note in passing that the current A.B.A. Standards for Criminal Justice assume the relevance of such information in guidelines on jury trials (Standard 15-3.4) and on presentence reports (Standard 18-5.1). Appellants place a wholly misconceived reliance upon *Henry v. Wainwright*, 661 F. (2d) 56, for no claim is made that a prior criminal record constitutes an "aggravating circumstance" in South Carolina. The position taken by appellants would lead to an inconsistent result: the defendant convicted of an aggravated murder would enjoy greater protection in the determination of his sentence than a defendant found guilty of far lesser offenses. We decline to adopt such a view and instead hold that information concerning prior criminal convictions shall be admissible as additional evidence during the sentencing or resentencing phase of a capital trial under our statute.

We find, therefore, that Plath's criminal record was properly admitted in accordance with our statute and the course of the previous conviction trial.

(b) Appellant Plath offered testimony of several witnesses to his jailhouse religious conversion and to his subsequent good works of Christian devotion. Apparently Plath made or took part in making two inspirational tape cassettes for use in instructional programs aimed at youthful offenders. He declined to introduce one of the tapes, contending it contained prejudicial matter, and he was successful in preventing its admission by the State. In turn, when Plath offered the second tape, the Solicitor objected, and the objection was sustained. Thus, neither tape was played to the jury, and Plath claims error in the second (but not the first) ruling of the trial court.

We find neither an abuse of discretion nor any prejudice to the appellant. The jury heard at great length about appellant's religious pursuits, including the tapes, and the beneficial results thereof. The jury had every opportunity to weigh these matters in mitigation. Actual playing of the tapes would have been merely cumulative and would in effect have constituted self-serving, unsworn testimony by the appellant which he had no right to offer.

(c) Appellant Arnold objects to the cross-examination of his expert witnesses in which other death penalty trials were mentioned by name. Apparently these witnesses had presented similar testimony in other cases, to no avail it seems since those defendants also were sentenced to death. Arnold now argues that reference to other capital cases introduced an arbitrary factor into this trial.

The testimony at issue concerned the effectiveness and propriety of capital punishment. This Court has held such testimony to be improper and impermissible. *State v. Gilbert*, 277 S. C. 53, 58, 283 S. E. (2d) 179, 181, cert. denied, 456 U. S. 984, 102 S. Ct. 2258, 72 L. Ed. (2d) 863; *State v. Woomer*, 278 S. C. 468, 473, 299 S. E. (2d) 317, 320, cert. denied, _____ U. S. _____ , 103 S. Ct. 3572, 77 L. Ed. (2d) 1413. Assuming, however, that the defendants were permitted to attack capital punishment broadside, it was not improper for the State to cross-examine defense experts as necessary to reveal the bases and

weaknesses of their testimony. *State v. Plath*, 277 S. C. 126, 141, 284 S. E. (2d) 221, 229.

Arnold's experts testified to declining execution rates and claimed to have discovered an international trend away from capital punishment. In light of these global assertions, it was a proper response for the State to point out that the same experts had themselves been unable to persuade a few dozen jurors across the State. We see no merit in the appellant's claim of prejudice.

(d) Appellants allege error in the conduct of the jury visit to the scene of the crime. At trial, counsel for the appellants opposed the State's motion for a jury view, which objection was overruled in the proper exercise of the court's discretion. See Section 14-7-1320, Code of Laws of South Carolina, 1976. At no time did counsel for the appellants request permission to accompany the jury or to have the appellants do so. All arrangements for the jury view were thoroughly discussed with counsel in the presence of the defendants, and no hint of opposition on their part was expressed. Indeed, the record reflects that shortly before this colloquy, counsel for appellant Plath requested that the next day's proceedings commence later than usual to enable him to consult with witnesses. This particular request was denied, yet the effect of the jury view without counsel or defendants created the delay they had actually sought.

Appellants contend that the jury view in their absence and that of counsel worked a denial of constitutional rights to counsel and confrontation. Appellants acknowledge that in *Snyder v. Massachusetts*, 291 U. S. 97, 54 S. Ct. 330, 78 L. Ed. 674, the United States Supreme Court held that a jury view of the crime scene does not constitute part of a trial for purposes of a defendant's due process right to be present. With specific regard to the simple inspection such as here occurred, Justice Cardozo wrote for the Snyder majority:

> The Fourteenth Amendment does not assure to a defendant the privilege to be present at such a time. There is nothing he could do if he were there, and almost nothing he could gain . . . If the risk of injustice to the prisoner is shadowy at its greatest, it ceases to be even a shadow when he admits that the jurors were brought to the right place and shown what it was right to see.

291 U. S. at 108, 54 S. Ct. at 333, 78 L. Ed. at 679-680.

Despite the passage of almost fifty years since the Snyder decision, the appellants can direct us to no federal decision that has yet determined a case of this sort raises constitutional principles. The only federal case cited by appellants is *U. S. v. Walls*, 443 F. (2d) 1220, in which the court expressly declined to rule on constitutional issues and instead rested its reversal upon the power to supervise other federal courts.

We adhere to this Court's holding in *State v. Suber*, 89 S. C. 100, 106, 71 S. E. 466, that a jury view of the scene is not a taking of testimony. Constitutional protections are not implicated or denied when, as here, the trial judge in fact accompanies the jury in the absence of defendants and their counsel, there having been neither an objection to the arrangement nor even a request to be taken along. With respect to this exception of appellants, the conclusion of Justice Cardozo's *Snyder* opinion merits some thought:

> There is danger that the criminal law will be brought into contempt — that discredit will even touch the great immunities assured by the Fourteenth Amendment — if gossamer possibilities of prejudice to a defendant are to nullify a sentence pronounced by a court of competent jurisdiction in obedience to local law . . . .

291 U. S. at 122, 54 S. Ct. at 338, 78 L. Ed. at 687.

(3) *Misconduct of the Solicitor.*

Appellants contend they suffered prejudice by reason of prosecutorial misconduct in several particulars: (a) cross-examination and jury argument suggesting appellants might escape or be released unless put to death; (b) jury argument concerning appellants' failure to testify; (c) jury argument referring to this Court's opinion in *State v. Plath*, 277 S. C. 126, 284 S. E. (2d) 221; (d) generally inflammatory speech in closing argument.

(a) Two episodes of cross-examination are involved in this appeal. The first incident occurred after the direct examination of Professor Bruce Pearson, an anthropologist at the University of South Carolina, whose opinion was that life imprisonment represented a mode of expressing societal disapproval superior to capital punish-

ment. Counsel for Arnold specifically questioned the witness about life imprisonment in South Carolina as he had observed it in the course of five years as a regular, weekly visitor to the Central Correctional Institute in Columbia. The following passage is illustrative (with emphasis added):

> Question: Now, should this jury bring back a life imprisonment verdict, would John move into other quarters?
>
> Answer: Well, as the prison is now set up, people serving life terms would be sent to either the old cell block or one of the barrack type wards.
>
> Question: Would John's life or quality of living actually improve if he went into the general population or would it even get worse?
>
> Answer: Well, it's hard to say ... when you know that they are going to lock the key and close the door behind you *and you are not going to leave* [it] doesn't make too much difference if they have you in a big luxury hotel, *if you were locked in,* it would still be a prison and I can assure that CCI is not a luxury hotel.
>
> Question: If Mr. Arnold went to general population, would his life improve markedly?
>
> Answer: Well, that's a difficult question to answer. In some ways it would improve but in other ways it would remain the same, I think.
>
> Question: We are still dealing with loss of liberty.
>
> Answer: That's right.

Immediately following this exchange, and in response to questions by counsel for Plath, the witness described life imprisonment as a form of slavery.

Clearly the thrust of this defense testimony was to demonstrate the permanence and deprivation entailed in life imprisonment. Since the witness claimed an intimate knowledge of CCI, and based his testimony upon that knowledge, it was not amiss for the State to pursue his claim more closely. In the course of this inquiry the allegedly prejudicial matter arose. Specifically the witness was asked if he had investigated the case of a particular inmate who had escaped while serving a life term. The escape evidently took place while the inmate was performing errands outside the prison walls. Portions of the offensive interrogation follow:

Question: Now, what I want to know Doctor, knowing you were going to come back here and testify and knowing that I told you about Lewis Bostick ... did you investigate it to see whether or not when you send somebody to life imprisonment at the penitentiary, it doesn't really mean they are confined in a cell for the rest of their life, have you investigated that?

Answer: That is really not an area that I have taken as part of my studies.

Question: Well, why wouldn't it, doctor, wouldn't that be important to tell a jury ... if you tell them they are going to be locked up in a cell the rest of their life, wouldn't it be important to know that that's not a correct statement?

Answer: (No response.)

This identical line of questioning was the subject of exception in *State v. Plath*, 277 S. C. 126, 140-141, 284 S. E. (2d) 221, 229. On that occasion we held the inquiry to be proper as a test of the information upon which the witness based his opinion. After the passage of three years, and in light of the expert's claimed familiarity with the life imprisonment regime, we believe the State and the jury were doubly entitled to know why the witness had not investigated this rather extraordinary episode. His unexplained failure to do so was directly relevant to his credibility as an unbiased social scientist.

Appellants next protest the State's cross-examination of witness Cathy Brazell, a social worker engaged in prison ministry. Mrs. Brazell testified about her religious work with appellant Plath and her belief in the genuine character of his religious conversion. On direct examination she also related that her son had been the victim of a tragic slaying, stressing thereby her belief in prayer and forgiveness. On cross-examination, the State produced a letter written to the Solicitor by the same witness and prompted by her own son's death. In the letter she complained that the multiple murderer, Donald H. "Pee-Wee" Gaskins, was allowed to move freely about the prison as a messenger boy notwithstanding his compound life sentences. *See State v. Gaskins*, 270 S. C. 296, 242 S. E. (2d) 220.

Appellants strenuously object to this cross-examination and to subsequent jury argument based upon it. They contend

the subject matter was irrelevant and not responsive to any testimony of defense witnesses. They believe themselves to have been prejudiced by the introduction of an arbitrary factor into the sentencing deliberations — that is, speculation as to possible escape or premature release. We find that the record, read as a whole, fails to support appellants' claims.

The course of this trial dramatically demonstrates why this Court has prohibited testimony on the theory and propriety of capital punishment as such. In this case, the defense sought to portray life imprisonment as preferable to capital punishment as a matter of social policy. With the exception of Dr. Neidig's testimony, the entire defense of appellant Arnold was based upon an attempted showing that capital punishment was an ineffective instrument of deterrence, a crude device for expressing social disapproval, and even a counterproductive approach to control of crime. As noted above, defense witness Pearson drew a picture of life imprisonment as slavery, a condition of irretrievable loss which he invited the jury to contemplate through vivid recollection of many years' experience in teaching and counseling inmates of CCI. This testimony was elaborated and bolstered through cross-examinations by counsel for appellant Plath. Parenthetically, we note and reject Plath's inconsistent contention that he was improperly denied a limiting jury instruction on the alternative penalties. We find, moreover, that the trial judge amply explained the binding effect of a jury recommendation in both his jury instructions and in the individual voir dire of jurors.

It is our settled view that such a defense is highly improper, for it invites the jury to intrude upon the strictly legislative function of determining the nature of crime and punishment under our Constitution. In the sentencing phase of a capital case, the jury shall understand the terms "life imprisonment" and "death sentence" in their ordinary and plain meaning without elaboration.

In the sentencing phase of a capital case, the function of the jury is not to legislate a plan of punishment but to make the "either/or" selection called for by the language of 16-3-20(A), Code, which in pertinent part provides: "A person who is convicted of or pleads guilty to murder shall be punished by death or by imprisonment for life...."

Such determinations as the time, place, manner, and conditions of execution or incarceration, as well as the matter of parole are reserved by statute and our cases to agencies other than the jury. As we have repeatedly stated, the sole function of the jury in a capital sentencing trial is the individualized selection of one or the other penalty, based upon the circumstances of the crime and characteristics of the individual defendant.

By way of illustration, in *State v. Woomer*, 278 S. C. 468, 299 S. E. (2d) 317, 319, we recently held that psychiatric evidence of future dangerousness was not prejudicial in the circumstances of that case. Subsequently the United States Supreme Court in *Barefoot v. Estelle*, ____ U. S. ____ , 103 S. Ct. 3383, 3396, 77 L. Ed. (2d) 1090, 1107, has recognized the utility of such testimony under the view that, "What is essential is that the jury have before it all possible relevant information about the individual whose fate it must determine."

On the other hand, this Court has held irrelevant testimony regarding a defendant's potential adjustment to the controlled environment of life imprisonment. *State v. Koon*, 278 S. C. 528, 536, 298 S. E. (2d) 769, 773. The distinction lies in the lack of logical connection between adaptability to confinement and the specific personality or character traits which were instrumental in leading the defendant to commit the particular crime at issue. The dividing line is fine indeed, yet not impossible of discernment. A jury needs to know how a given defendant came to commit a given aggravated murder, to include aspects of his background, his character and the setting of the crime itself which may explain or even mitigate the conduct of which he has been found guilty. A jury does not need to know how often he will take a shower or whether or not he will be lonely and withdrawn during his tenure at CCI.

It should not be necessary in the future for this Court to remind the bench and bar of the strict focus to be maintained in the course of a capital sentencing trial. In the case before us, defendants elected to enter the forbidden field of social policy and penology. It is neither surprising nor can it be deemed prejudicial that the State responded in kind, attempting to show through defendants' own witnesses that life imprisonment was not the total abyss which they portrayed it to

be. We read both the State's cross-examinations and subsequent jury arguments in light of the record as a whole. We find nowhere that the Solicitor sought to predict or to argue that these appellants would escape or would be improvidently released. Rather, his argument, particularly in its concluding passage, simply placed before the jury the stark choice between death and life imprisonment, emphasizing that his job was concluded and that the decision was to rest with them. His references to the cross-examinations just discussed strike the candid reader as merely reminders to the jury that life imprisonment was by no means as hopeless as defendants would have it believed. The State was entitled to make this response. The appellants have shown no prejudice therefrom.

(b) Appellants contend that in the course of his jury summation the Solicitor made prejudicial reference to their failure to testify. This claim takes his arguments out of context and disregards the entire thrust of the defense. From opening argument, through cross-examination of State witnesses, to final summation, counsel for both appellants stressed repeatedly the "unfairness" in the prosecution of this case. With indignation they pointed to the grant of immunity received by State's witness, Cindy Sheets, in contrast to the prospect of death for their clients. We cannot fault the defendants for offering to the jury this potentially persuasive argument. By the same token, however, we cannot deny the State an opportunity to explain the development of the case and the absolute necessity for testimony and cooperation by witness Sheets. This was done through examination of witnesses and argument to the jury.

In final summation, the Solicitor did indeed refer to the fact that neither Plath nor Arnold would be testifying in the trial, a statement which drew objection from the defense and a prompt apology to the jury by the Solicitor. We believe that any possible prejudice was cured, and we decline to adopt appellants' view that the Solicitor's apology somehow made matters worse. Beyond this, we note that the jury was amply instructed by the trial court concerning the right of a defendant to remain silent and put the State to its proof. Accordingly we find, in the circumstances, that the Solicitor's argument worked no prejudice to the appellants.

(c) Appellants object to portions of the Solicitor's argument which referred to this Court's decision in *State v. Plath*, 277 S. C. 126, 284 S. E. (2d) 221, particularly as we addressed the jury instruction on kidnapping as delivered in the original trial. Appellants interpret the argument as an effort to invoke the authority of this Court to preclude an independent jury determination on the aggravating circumstance of kidnapping. We find, however, that the passages complained of are not susceptible to this interpretation but are instead simply efforts by the State to explain the function of the jury at this trial and to argue to the jury the elements of kidnapping which the State had sought to prove. We see no way in which the jury in this case could have been misled by these arguments, especially in light of the trial judge's ample instructions both in the course of voir dire and at the conclusion of the evidence.

(d) Finally, appellants complain of rhetorical flourishes engaged in by the Solicitor in his summation, especially his expressed hope that the jurors would have the "guts to do your job." An inelegant turn of phrase or momentary lapse of good taste will rarely constitute prejudicial error, nor does robust language necessarily inject an arbitrary factor into a trial such as this one. Finding no prejudice here, we dismiss these claims of error as frivolous.

(4) *Aggravating Circumstances.*

Appellants complain first that the aggravating circumstance of kidnapping lacked any evidentiary basis in the record. The argument is specious. Section 16-3-910, Code (1982 Supp.), includes among the operative definitions of kidnapping the words "inveigle" and "decoy" along with such terms as "seize," "confine" and "abduct." The statute was read to the jury by the Solicitor and again read and explained by the trial judge. In its arguments the State emphasized the "confinement" of the victim, a fact sufficiently demonstrated by the testimony to raise a jury question. Such argument would not preclude the jury, however, from finding that the victim was lured — "inveigled" and "decoyed" — to her death by the appellants. If the jurors believed the State's witnesses, the victim was invited into the

appellants' car after they had formed and expressed the intention to carry away and murder her.

Appellant Plath claims that the trial judge improperly submitted the aggravating circumstance of "assault with intent to ravish" in light of the fact that the only aggravating circumstance submitted at the original sentencing trial was kidnapping. Section 16-3-20(C), Code, requires the trial judge to submit any statutory aggravating circumstances "which may be supported by the evidence." Appellant argues that the trial judge should *sua sponte* submit such circumstances of aggravation whether or not suggested by the State. On this premise he reasons that failure of the first trial judge to do so amounted to a finding that the evidence could not support the charge.

We reject this argument for a number of reasons. To begin with, the language of 16-3-20(C), Code, vests the trial judge with no authority or duty to add circumstances of aggravation to those submitted by the State. On the contrary the statute merely directs the trial court not to invade the jury province and not to withhold aggravating or mitigating circumstances which may be supported by the evidence. *Williams v. State,* 237 Ga. 399, 228 S. E. (2d) 806. Secondly, we conclude that the evidence amply supported a finding of assault with intent to ravish and that the jury was clearly entitled to consider and find such aggravation in this case. We find no double jeopardy issue. Assault with intent to ravish was never considered by the previous jury, thus precluding any notion that appellant Plath had once been acquitted thereof.

We find no prejudice to appellant Plath from the submission of an additional aggravating circumstance during this sentencing retrial. The function of aggravating circumstances in this State, as in Georgia, is to enable juries to identify death penalty candidates "in an objective, even-handed, and substantively rational way." *Zant v. Stephens,* ____ U. S. ____ , 103 S. Ct. 2733, 2744, 77 L. Ed. (2d) 235, 251. The statutory aggravating circumstances represent a legislative determination that certain murders are qualitatively different from all other wrongful killings. These are murders that "shake the conscience of the community." *State v. Adams,* 306 S. E. (2d) 208, 215.

A jury must find at least one statutory aggravating ■ circumstance or the death penalty shall not be imposed. Section 16-3-20(C), Code. Additional aggravating circumstances provide only alternative bases for placing a defendant in the category of persons subject to capital punishment. Additional aggravating circumstances do not, under our statute, contribute to the actual selection of the death penalty because juries in this State are not instructed to "weigh" circumstances of aggravation against circumstances of mitigation. *State v. Shaw*, 273 S. C. 194, 205, 255 S. E. (2d) 799, 804; *State v. Thompson*, 278 S. C. 1, 5, 292 S. E. (2d) 581, 584; c.f., *Zant v. Stephens*, 250 Ga. 97, 297 S. E. (2d) 1, quoted with approval in *Zant v. Stephens*, ___ U. S. at ___ , 103 S. Ct. at 2739-2741, 77 L. Ed. (2d) at 245-248.

The submission of "assault with intent to ravish" dur- ■ ing sentencing retrial in no way prejudiced appellant Plath. Even in the absence of that aggravating circumstance, his sentence of death would receive ample support from the independent finding of kidnapping as an aggravating circumstance. *Zant v. Stephens*, ___ U. S. at ___ , 103 S. Ct. at 2745-2746, 77 L. Ed. (2d) at 253-254.

(5) *Proportionality Review.*

Sentences of death imposed upon appellants Plath and ■ Arnold for this aggravated murder must be sustained in light of the crime and the individual defendants. In April 1978, the appellants came to South Carolina from Pennsylvania accompanied by two female juveniles. On the morning of April 12th, the foursome offered a ride to the victim, a black lady who was hitchhiking to work. After leaving her at a point along the road, the appellants returned and invited her back into the car. Appellant Arnold had already expressed his desire to kill the victim because he "didn't like niggers."

The party then drove to a remote dump site where the crime was committed. Testimony revealed that the victim was beaten and kicked, cursed and otherwise verbally abused. She was forced to strip naked, to perform acts of oral sex upon Plath and upon one of the young females, all the while being beaten. Plath urinated in the mouth of the victim, demanding that she swallow his urine. There then followed a killing of

incomprehensible savagery. The victim was beaten, kicked, stamped and jumped upon, choked (with a belt and rubber hose), and stabbed (with a pocket knife and broken bottle).

By way of mitigation, an expert witness for Arnold testified that a facial birthmark and other personality disorders led him to this crime. The same expert testified also that Arnold knew the difference between right and wrong. Plath offered testimony to his unhappy childhood with an allegedly drunken divorced mother and without positive male guidance during his formative years. Plath also submitted evidence of his religious activities described above. The State countered, in part, with Plath's previous admission that he had been wearing a cross at the time of this crime.

The jury was appropriately instructed to consider all evidence in mitigation. We are satisfied that the jury was disposed to and did in fact give every beneficial consideration to which these appellants were entitled. The trial judge noted for the record that some jurors shed tears at the announcement of the verdicts. Yet when polled, none wavered in holding to the decisions. The trial judge found that the verdicts were supported by the evidence and were not based on passion, prejudice or any other arbitrary factor. We agree and add that the recommended sentences are wholly commensurate with this crime. Lacking precisely identical cases with which to compare these verdicts, we are convinced that the sentence of death is neither excessive nor disproportionate in light of this crime and these defendants. The atrocious nature of this murder resembles in some respects the cases of *State v. Shaw*, 273 S. C. 194, 255 S. E. (2d) 799, and *State v. Woomer*, 278 S. C. 468, 299 S. E. (2d) 317. As in those cases, the sentences of death are affirmed.

LITTLEJOHN, NESS, GREGORY and HARWELL, JJ., concur.