504 S.E.2d 822

**Donald Allen JONES, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

**No. 24832.**

Supreme Court of South Carolina.

Heard Oct. 3, 1995.
Decided Aug. 31, 1998.
Rehearing Denied Oct. 7, 1998.

John H. Blume and Teresa L. Norris, both of Center for Capital Litigation; and South Carolina Office of Appellate Defense, Columbia, for petitioner.

Attorney General Charles Molony Condon and Assistant Deputy Attorney General Donald J. Zelenka, Columbia, for respondent.

## ON WRIT OF CERTIORARI

TOAL, Justice:

We granted a petition for writ of certiorari from Donald Allen Jones to review the question of the denial of his right to effective assistance of counsel. We affirm the circuit court's order of dismissal.

### FACTUAL/PROCEDURAL BACKGROUND

In October 1983, Donald Allen Jones broke into the residence of Ned and Geraldine Plyler, while they were away. He stole some money from the house. When the Plylers returned, Jones attacked them, killing Mr. Plyler and then raping Mrs. Plyler.

Jones was arrested and tried. He was convicted of murder, armed robbery, criminal sexual conduct, housebreaking, grand larceny, and kidnapping, and was sentenced to death. His convictions and sentence were affirmed by this Court in *State v. Jones*, 288 S.C. 1, 340 S.E.2d 782 (1985). The United States Supreme Court vacated this judgment in *Jones v. South Carolina*, 476 U.S. 1102, 106 S.Ct. 1943, 90 L.Ed.2d 353 (1986), in light of *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). The case was remanded for a new sentencing proceeding in which Jones would be allowed to present evidence of his future adaptability to life in prison. At the resentencing, Jones was again sentenced to death. On direct appeal from his resentencing, Jones argued, *inter alia,* the trial judge erred in refusing to submit as a statutory mitigating circumstance that the murder was committed while he was under the influence of mental or emotional disturbance. *See* S.C.Code Ann. § 16–3–20(C)(b)(2) (Supp.1996). This Court found there was no evidence presented which indicated, at the time of the murder, Jones was under the influence of mental or emotional disturbance and, therefore, concluded the trial judge properly refused to charge the statutory mitigating circumstance. *State v. Jones*, 298 S.C. 118, 378 S.E.2d 594

(1989), *cert. denied,* 494 U.S. 1060, 110 S.Ct. 1534, 108 L.Ed.2d 773 (1990).

In 1990, Jones filed an application for Post–Conviction Relief ("PCR"). After an evidentiary hearing, the circuit court issued an order of dismissal. Jones's Rule 59(e) motion to alter or amend the final order was denied. He then filed a petition for writ of certiorari, and this Court granted certiorari to review one question. This question is divided into two parts:

1. Was Jones denied the right to effective assistance of counsel at his resentencing proceeding as a result of trial counsel's failure to adequately investigate and present relevant mitigating evidence regarding his impoverishment, the neglect and abuse to which he was subjected, his severe mental illness, and his neurological impairment?

2. Was Jones denied the right to effective assistance of counsel as a result of trial counsel's introduction of evidence that Jones had previously been sentenced to death?

## LAW/ANALYSIS

### A. MITIGATING EVIDENCE: SOCIAL HISTORY AND MENTAL IMPAIRMENT

 Jones argues that he was denied the right to effective assistance of counsel during his resentencing proceeding because his attorneys failed to thoroughly investigate and present mitigating evidence regarding his mental impairments. Specifically, Jones argues resentencing counsel were ineffective because they failed to adequately investigate his social history, obtain his mental records, and provide this information to his one expert witness, Dr. Diane Follingstad. He further claims counsel were ineffective because they did not obtain the neurological testing specifically recommended by Dr. Follingstad. Jones maintains a complete picture of his mental condition would have established he was suffering from a mental or emotional disturbance at the time he committed the murder and, thereby, entitled him to a charge on the additional statutory mitigating circumstance. *See* S.C.Code Ann. § 16–3–20(C)(b)(2) (the murder was committed while the

defendant was under the influence of mental or emotional disturbance).

Under the test for ineffective assistance of counsel enunciated in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the petitioner must establish that counsel's representation fell below an objective standard of reasonableness. Then he must show that the deficient performance prejudiced the defense. When a defendant challenges a death sentence, prejudice is established when "there is a reasonable probability that, absent [counsel's] errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698.

Even if we assume in the present case that counsel's representation fell below an objective standard of reasonableness, Jones fails the prejudice prong of the *Strickland* test. We find that there is not a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. In deciding whether Jones was prejudiced, we must bear in mind the strength of the government's case and the aggravating factors the jury found, as well as the mitigating factors that might have been presented if Jones had been provided effective assistance of counsel. *See Stafford v. Saffle,* 34 F.3d 1557, 1564 (10th Cir.1994), *cert. denied,* 514 U.S. 1099, 115 S.Ct. 1830, 131 L.Ed.2d 751 (1995). The bottom line is that we must determine whether or not Jones has met his burden of showing that it is reasonably likely that the jury's death sentence would have been different if counsel had presented additional information about Jones's mental condition. In making this determination, we must consider the totality of the evidence before the jury.[1] *See Strickland,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

---

1. It should be clarified that our approach in this case is not inconsistent with, nor does it abrogate, precedent that has held that a jury should not be instructed to "weigh" the aggravating circumstances against the

In this case, the jury was presented with overwhelming evidence of Jones's guilt and of the aggravating circumstances surrounding the murder. During the resentencing proceeding, testimony revealed how Jones, a former employee of the Plylers, broke into their home on October 11, 1983. After entering onto the property, he stole some money from the home and, while there, shot the Plylers' three dogs. When the Plylers eventually returned, Jones was standing on the porch. He approached Mr. Plyler, demanded money, and then from a few feet away, shot him with a shotgun. Mr. Plyler took a few steps and slumped forward on his face. Jones demanded that Mrs. Plyler remove the money that was in her husband's pocket. When she failed, Jones removed the money himself. Despite Mrs. Plyler's plea that he not shoot again, Jones shot Mr. Plyler in the head two more times with a pistol.

He then grabbed Mrs. Plyler by the elbow, took her inside, and sexually assaulted her at gunpoint in various rooms in the house for approximately two hours. At one point, he informed her he had killed her dogs and threatened to kill her son.

---

mitigating circumstances. *See State v. Bellamy*, 293 S.C. 103, 359 S.E.2d 63 (1987), *overruled on other grounds* by *State v. Torrence*, 305 S.C. 45, 406 S.E.2d 315 (1991). Our analysis here relates not to jury instructions, but to determining, for purposes of post-conviction relief, ineffective assistance of counsel in death penalty cases.

A review of case law reveals why juries are not instructed to weigh aggravating and mitigating circumstances. In *State v. Shaw*, 273 S.C. 194, 205, 255 S.E.2d 799, 804 (1979), *cert. denied*, 444 U.S. 957, 100 S.Ct. 437, 62 L.Ed.2d 329 (1980), we rejected the defendants' contention that the death penalty "statutory complex is constitutionally defective because it does not assign numerical values to the aggravating and mitigating circumstances so that the sentencing authority can determine when the mitigating circumstances outweigh the aggravating circumstances." Based on this reasoning, *State v. Plath*, 281 S.C. 1, 19, 313 S.E.2d 619, 629, *cert. denied*, 467 U.S. 1265, 104 S.Ct. 3560, 82 L.Ed.2d 862 (1984) declared that "Additional aggravating circumstances do not, under our statute, contribute to the actual selection of the death penalty because juries in this State are not instructed to 'weigh' circumstances of aggravation against circumstances of mitigation." Thus, the type of "weighing" we have disapproved of is that which requires a jury to determine life or death on the basis of the numerical weight of the aggravating and mitigating circumstances. The "weighing" that is permissible is the *considering* of any mitigating and aggravating circumstances. *See Bellamy*, 293 S.C. at 107, 359 S.E.2d at 65.

Jones left Mrs. Plyler blindfolded, gagged, and tied to a bed. She heard him start her pickup truck, then immediately turn it off. Jones returned to the house; he told Mrs. Plyler he was checking to see if she was attempting to escape. Jones then drove away in the truck. Mrs. Plyler testified she untied herself and escaped from her home. For twenty minutes she worked her way in the dark over a barbed wire fence and through a pasture, towards a neighbor's home. Mrs. Plyler saw Jones return in the pickup truck; he appeared to enter the Plylers' home. He then left the home and drove the pickup truck back and forth, apparently in search of Mrs. Plyler. At one point, Jones stopped the vehicle and turned off its lights within fifteen feet of where Mrs. Plyler was hiding. Eventually, Jones drove off, and Mrs. Plyler was able to reach a neighbor's home. She reported the events to police. Jones was soon thereafter arrested. He was identified by Mrs. Plyler, who knew him prior to these incidents. Moreover, physical evidence linked him to the crime. His palm prints were found inside the Plylers' residence.

In mitigation, Jones presented six witnesses who were familiar with his background. These included a school teacher, four family members, and a psychologist. Jones's third grade teacher stated that Jones had difficulty retaining skills and that he was in special education classes. Jones's aunt also testified on his behalf about his childhood and stated that Donald smiled inappropriately, although his behavior generally was not unusual. In his later years, he would wear shorts in the winter and a coat during the summer. While in jail, he would respond to letters from family members by rewriting and returning the correspondence he had received.

Jones's mother testified to other unusual behavior by Jones. On two occasions, he engaged in "tearing [his mother's] house up." He would sometimes take a bath using big buckets. He would sit on the side of the bridge and "look like he was just in a deep wonder." He began doing these things after his sister's death. Another of Jones's aunts testified that he was a happy and obedient child. While in prison, Jones also answered her letters by sending the same letter back. Moreover, Jones's uncle testified on his behalf.

Thus, extensive evidence was presented at the resentencing hearing about Jones's family and social background through his teacher, mother, two aunts, and uncle. They highlighted the changes that occurred in him after the death of his sister and pointed out his unusual behavior.

In addition, counsel presented Dr. Diane Follingstad, a clinical psychologist, who had tested Jones. Dr. Follingstad had administered tests that screen for brain damage. She testified that Jones had "some mental deficiency." Further, she indicated that she had administered the Wechsler Adult Intelligence Scale ("WAIS") test on Jones. On the WAIS, he scored a 74 as to verbal I.Q., a 63 on the performance I.Q., achieving an overall I.Q. of 67, which is in the "mentally retarded range." She testified that with an I.Q. of 67, Jones "would have only one and a half percent of the population lower than him." [2] She also gave him the Bender Gestalt test and Trails test, which screen for organic brain damage. On these tests, Jones scored "within a brain damaged range," which suggested "he does have some problem with the actual functioning of his brain." She further stated that Jones

does act impulsively, that he doesn't think things through, that he does have very poor judgment, extremely poor judgment, that he doesn't seem to have the ability to really be able to stop and consider a variety of options. He also doesn't have a lot of information about the world to use, and he also doesn't have many options to get society's rewards in a more legitimate way, . . . but that he just—he doesn't see many options for himself.

She did not specifically diagnose Jones as being mentally ill at the time of the murder.

Against the recommendation of defense counsel, Jones testified during resentencing. He admitted planning to steal money from the Plylers several days before he actually committed the crimes. Jones explained he stole a shotgun and shells. He hid the shotgun before going to rob the Plylers. He testified he planned to have Mrs. Plyler write a check and then hold her hostage until the bank opened. Once he cashed the check, he planned to kill Mrs. Plyler.

---

**2.** These were nearly the same scores determined by Dr. James Evans, who testified for Jones at the PCR hearing.

Jones stated that on the day of the crimes, he shot the Plylers' dogs, broke a window on the side of their home where no one would notice, and waited in the Plylers' home for them to return. Since he only had a few shotgun shells, Jones testified he loaded the shotgun with some of Mr. Plylers' own shells and test-fired the shotgun against a wall of the home. While waiting, Jones cut the ropes he used to bind Mrs. Plyler and located Mr. Plyler's pistol.

Jones testified that when the Plylers returned home, he did not ask Mr. Plyler to give him his money, but immediately shot him with the shotgun. Jones admitted he knew Mr. Plyler was still alive, so Jones shot him twice with Mr. Plyler's own pistol. Jones acknowledged the Plylers, for whom he had worked, had been good to him, and he had nothing against them.

Based on the evidence presented in the resentencing phase, the jury considered five statutory aggravating circumstances: (1) robbery while armed with a deadly weapon; (2) larceny with the use of a deadly weapon; (3) housebreaking; (4) criminal sexual conduct in the first degree; and (5) kidnapping. Moreover, the following statutory mitigating circumstances were considered: (1) the defendant has no significant history of prior criminal conviction involving the use of violence against another person; (2) the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; (3) the age or mentality of the defendant at the time of the crime; and (4) other mitigating circumstance or circumstances otherwise authorized by law.

After deliberating, the jury found beyond a reasonable doubt the existence of all five aggravating circumstances listed above and recommended that Jones be sentenced to death for the murder of Ned Plyler. The resentencing judge then found as an affirmative fact that the evidence of the case warranted the imposition of the death penalty and that its imposition was not the result of prejudice, passion, or any other arbitrary factor.

At the PCR hearing, Jones presented the testimony of four experts. Patricia Feigley, a clinical social worker, testified about the importance of conducting a family and social history.

Testifying at length about Jones's upbringing and poor physical and social environment, she indicated that he was mentally retarded and suffered from a speech defect. Dr. James Evans, a clinical psychologist, testified that he had tested Jones and had concluded that Jones had an I.Q. of 69, within the range of mental retardation. Jones had a poor memory and exhibited signs of neuropsychological dysfunction and organic brain dysfunction.

A neurologist Dr. Nancy Earl stated that Jones showed signs "consistent with the diagnosis of mental retardation and organic brain dysfunction or syndrome," and he had difficulty thinking in abstractions. Jones's language was within the range of normality, but his speech was not normal. He could understand and relate fairly well with concrete concepts, but had considerable difficulty with more abstract concepts.

The diagnostic impressions of Dr. Billy Royal, a psychiatrist, were that Jones suffered from mild mental retardation, organic mental syndrome, and psychotic disorder. Although Royal admitted that a 1983 neurological examination of Jones had not revealed organic brain damage, he stated that a neuropsychological test may have been necessary to detect it.

In summary, these experts testified that Jones was mentally retarded, had brain damage, and suffered from mental illness. The witnesses concluded Jones had each of these disorders at the time the crimes were committed. The experts maintained Dr. Follingstad did not have an adequate social history, complete mental records, and sufficient testing, such as a neurological examination, by which to evaluate Jones and, accordingly, she could not have diagnosed Jones as suffering from mental illness.

With regard to Jones's mental condition, even if counsel had fully explored the mitigating circumstance of his mental incapacity, all that would have occurred at the resentencing was that the jury would have heard a more elaborate version of Dr. Follingstad's testimony. Follingstad did discuss that Jones was in the range for organic brain damage, that he fell within the "mentally retarded range," and that his I.Q. ranked in the lowest one and one-half percent in the population. Mental retardation and organic brain dysfunction were the same ailments discovered by Drs. Earl, Evans, and Royal, the

experts Jones presented at the PCR hearing. We find that additional evidence about Jones's mental impairment would not have revealed anything significantly different than that which the jury was presented.

At the sentencing hearing, the mentality of Jones was the focus of his mitigation case. His counsel's strategy was not to portray Jones as being under active mental and emotional disturbance, but rather to emphasize his mental retardation, as evidenced by his upbringing.[3] This strategy obviously did not succeed. Just because it was unsuccessful does not mean that Jones can now recharacterize the evidence and claim that counsel did not adequately present mitigation evidence. The "new" evidence is the same as the "old" evidence. At best, it is a fancier mitigation case. If the evidence was not persuasive in the first case, the defendant does not get a second chance. Otherwise, there would never be an end to litigation.

Nevertheless, for purposes of the *Strickland* analysis, let us assume that if Jones's PCR experts had been presented at the resentencing hearing, Jones would have been entitled to an instruction on the additional mitigating circumstance found in section 16–3–20(C)(b)(2). Even if counsel's representation was not objectively reasonable, Jones has not met his burden of establishing prejudice under *Strickland*. From the testimony presented, the jurors were aware that Jones was mentally retarded, that he had brain damage, and that he often behaved in a bizarre manner. They were given several mitigating factors through which to consider the mental condition of Jones. They were also presented with overwhelming evidence of Jones's guilt and the callous and heinous way in which Jones calculated and executed the murder. They also considered the other aggravating factors surrounding the murder. Under these circumstances, there is no reasonable probability the sentencer would have concluded the balance of aggrava-

---

**3.** *See Truesdale v. Moore,* 142 F.3d 749, 753–54 (1998) ("The Supreme Court has instructed us to 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' Thus we ask not whether, with the benefit of hindsight, we would have conducted the defense differently.... Rather we must place ourselves in the shoes of [defendant's] attorneys and ask only whether their choices were objectively unreasonable.") (internal citation omitted).

ting and mitigating circumstances did not warrant death, even if it had knowledge that, at the time of the murder, Jones was under the influence of a mental disturbance. Accordingly, Jones fails to establish ineffective assistance of counsel under *Strickland.*

The dissent posits that *Strickland*'s standard (whether there is a reasonable probability that, absent the errors, the sentencer would have concluded the balance of aggravating and mitigating circumstances did not warrant death) is a specific application under the Florida statutory sentencing scheme, and does not have applicability here because South Carolina has a different statutory scheme. A perusal of *Strickland* itself, as well as other cases, will reveal that *Strickland* is not so limited. In relation to its prejudice prong, *Strickland* declared:

> When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

*Strickland,* 466 U.S. at 695, 104 S.Ct. at 2068–69, 80 L.Ed.2d at 698. The United States Supreme Court set forth the above standard for determining prejudice for all ineffective assistance of counsel cases challenging death sentences. It did not restrict the above test to cases arising under statutory sentencing schemes such as that utilized in Florida.

This was confirmed by *Plath v. Moore,* 130 F.3d 595 (4th Cir.1997). In *Plath,* the Fourth Circuit considered an ineffective assistance of counsel claim by John Plath, who had been sentenced to death in South Carolina. In affirming the denial of a petition for writ of habeas corpus, the Court stated:

> [W]hen considered against the sheer magnitude of the aggravating evidence against Plath, it is difficult to see the allegedly unreasonable omission of this mitigating evidence as prejudicial. As in *Strickland,* "[g]iven the overwhelming

aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." Thus, in weighing the omitted evidence against that actually used to convict and sentence Plath, the mitigating evidence seems insufficient to shift the balance in Plath's favor.

*Plath,* 130 F.3d at 602; *see also Waldrop v. Jones,* 77 F.3d 1308, 1312 (11th Cir.) ("When challenging a death sentence, a petitioner must show that 'there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' "), *cert. denied,* —— U.S. ——, 117 S.Ct. 247, 136 L.Ed.2d 175 (1996).

## B. EVIDENCE OF PREVIOUS DEATH SENTENCE

 Jones next argues that he was denied the right to effective assistance of counsel because of counsel's introduction of evidence that Jones had previously been sentenced to death. We disagree.

At the resentencing hearing, Jones's attorney called Sylvester Williams to testify. In the course of his testimony, Williams recounted an incident between Jones and himself:

The officer let me out my cell to get a haircut, and on my way back to the cell Donald Jones was around my side, and he was supposed to be on death row, and inmates on lock-up and death row don't suppose to mingle together, so he was down there with no handcuffs on, and I was handcuffed in the front, and me and him had had a few words about a week ago, and the correction officer had told me—. . . .

and,

It really wasn't no conflict. It was words, you know, and death row inmates is up on the third—like a two story house. It's a three story house. . . .

Jones argues that as a result of these references to "death row," the reliability of the jury's verdict and sentence was diminished by the knowledge that another jury had sentenced Jones to die for the same offenses that were under consideration at the resentencing hearing.

342

In *Romano v. Oklahoma,* 512 U.S. 1, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994), the United States Supreme Court held that evidence of a defendant's prior death sentence did not deprive him of a fair sentencing proceeding. Jones argues *Romano* is distinguishable because in that case, the jury was made aware that the defendant had been sentenced to die for another offense.

Jones's ineffectiveness argument lacks merit for several reasons. In the present case, there was no formal introduction of evidence of his previous death sentence. There was only a passing reference to "death row" from which the jury may have inferred that Jones had been sentenced to death before. Second, the statement did not state that he was on death row for committing the crimes against the Plylers. It may have been construed by the jury as a death sentence for a previous crime.

Most importantly, however, Jones cannot escape the underlying rationale of *Romano:* "We do not believe that the admission of evidence regarding petitioner's prior death sentence affirmatively misled the jury regarding its role in the sentencing process so as to diminish its sense of responsibility." *Id.* at 10, 114 S.Ct. at 2010, 129 L.Ed.2d at 11; *see also State v. Bell,* 302 S.C. 18, 24, 393 S.E.2d 364, 368 ("[W]e also reject Bell's argument that the jurors' knowledge of the previous death sentence diminished their sense of responsibility in deciding what sentence to impose."), *cert. denied,* 498 U.S. 881, 111 S.Ct. 227, 112 L.Ed.2d 182 (1990). Jones has not established how this passing reference to "death row" has misled the jury regarding its role in the sentencing process or diminished its sense of responsibility. Because Jones clearly fails to meet *Strickland*'s prejudice prong, we need not address the first prong of the test.

## CONCLUSION

For the foregoing reasons, the PCR court's order is **AFFIRMED.**

MOORE, WALLER and BURNETT, JJ., concur.

FINNEY, C.J., dissenting in separate opinion.

FINNEY, Chief Justice:

I respectfully dissent and would grant petitioner a new sentencing hearing.

On direct appeal from his resentencing proceeding, petitioner contended the trial judge committed reversible error in denying petitioner's request to charge the jury on the statutory mitigating circumstance that the murder was committed under the influence of mental or emotional disturbance. S.C.Code Ann. § 16–3–20(C)(b)(2) (Supp.1995). The majority of the Court affirmed the refusal to charge, holding, "There was no evidence at trial that, at the time of the murder, Jones was under the influence of a mental or emotional disturbance." *State v. Jones*, 298 S.C. 118, 123, 378 S.E.2d 594, 597 (1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1534, 108 L.Ed.2d 773 (1990). I alone dissented, finding evidence in the record to support the requested charge. *Id.* at 126, 378 S.E.2d at 598 (Finney, A.J., dissenting). In light of the majority opinion in petitioner's direct appeal, it is *res judicata* that there was *no evidence* presented at the resentencing proceeding that petitioner was suffering from any mental or emotional disturbance at the time he killed Mr. Plyler and assaulted Mrs. Plyler. *State v. Gilbert*, 277 S.C. 53, 283 S.E.2d 179 (1981) (subsequent history omitted) (issues decided in first appeal are *res judicata* in later proceedings).

In this post-conviction relief (PCR) proceeding, petitioner alleged resentencing counsel were ineffective in failing to present evidence of his mental and emotional state so as to entitle him to a charge on the "mental/emotional disturbance" mitigating circumstance. The PCR judge denied relief. Rather than review the actual issue before this Court today, the majority opinion restates the question, and concludes that the evidence presented at the PCR hearing regarding petitioner's mental and emotional condition was merely cumulative to that presented at the original resentencing proceeding, and thus petitioner cannot meet his burden of demonstrating prejudice.

It appears that the Court today has recognized that my position in 1989 was correct, and that the evidence presented at the resentencing entitled petitioner to a mitigating charge. We were therefore in error in failing to reverse that resen-

tencing on direct appeal. In my view, it is patently unfair and disingenuous to use our 1989 error as the reason we must also deny petitioner relief in 1997. The procedural posture of this case is that **no** evidence was presented at the resentencing proceeding that petitioner suffered from any mental or emotional disturbance at the time he committed this crime. *State v. Jones, supra.* The **new** evidence presented at the PCR hearing, as documented by the majority opinion, clearly would have entitled petitioner to a mitigating charge on mental/emotional disturbance. Counsel's failure to present this evidence was deficient.

The majority concludes petitioner failed to meet the prejudice prong of *Strickland* because "there is no reasonable probability the sentencer would have concluded the balance of aggravating and mitigating circumstances did not warrant death." This standard is a specific application of the oft-cited general rule of *Strickland* that to establish prejudice the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. 466 U.S. at 694, 104 S.Ct. 2052. This specific application of the rule is premised in *Strickland* on the United States Supreme Court's repeated recognition in that case that a capital penalty proceeding under Florida law requires the sentencer to weigh aggravating and mitigating circumstances. *See* Fla.Stat. § 921.141 (1997) (advisory jury must make finding whether mitigating circumstances outweigh aggravating circumstances; sentencing judge must find mitigating circumstances do not outweigh aggravating to impose death).

As noted by the majority, South Carolina, unlike Florida, does not require a weighing of aggravating and mitigating circumstances. Although a finding of an aggravating circumstance is necessary to support a death sentence, life may be imposed irrespective of such a finding and even in the absence of any mitigating circumstances. *See State v. Green,* 301 S.C. 347, 392 S.E.2d 157 (1990); S.C.Code Ann. § 16-3-20 (Supp. 1997). The sentencer always retains the discretion to impose a life sentence. Consequently, this Court has repeatedly held the failure to submit to the sentencing jury a mitigating circumstance supported by the evidence is reversible error with no requirement that actual prejudice be shown. *See*

*State v. Young,* 305 S.C. 380, 409 S.E.2d 352 (1991); *State v. Caldwell,* 300 S.C. 494, 388 S.E.2d 816 (1990); *State v. Pierce,* 289 S.C. 430, 346 S.E.2d 707 (1986).

Because South Carolina's capital sentencing procedure is unlike Florida's, the specific application in *Strickland* of the prejudice prong is not controlling here. We cannot determine prejudice by weighing the aggravating and mitigating circumstances since there is no objective standard by which to revisit the impact of aggravating and mitigating circumstances on the sentencer's decision. In my opinion, this Court must look instead to *Strickland*'s general rule that prejudice is shown by demonstrating a reasonable probability that the result of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 104 S.Ct. 2052.[1]

Here, petitioner was sentenced to death without the benefit of having the trial judge submit to the jury a mitigating circumstance to which he was entitled, and which could have swayed the jury, or even one juror, to impose life despite the aggravating circumstances in this case. *See* § 16–3–20(C) (jury shall not recommend death unless unanimous). This defect in petitioner's sentencing proceeding cannot help but undermine our confidence in the outcome. To conclude otherwise is to deny *Strickland*'s stated purpose—"to ensure a fair trial." 466 U.S. at 686, 104 S.Ct. 2052. I would reverse and remand for a new sentencing proceeding.

---

1. "[A] defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case." 466 U.S. at 693, 104 S.Ct. 2052.