627 S.E.2d 701

Keith Lasean SIMPSON, Respondent–Petitioner,

v.

Michael MOORE, Commissioner, S.C. Department of Corrections, and Henry Dargan McMaster, Attorney General, State of South Carolina, Petitioner–Respondent.

No. 26114.

Supreme Court of South Carolina.

Submitted April 20, 2005.
Decided Feb. 13, 2006.
Rehearing Denied March 22, 2006.

588

John H. Blume, III, and Sheri L. Johnson, both of Cornell Law School, of Ithaca, NY; and Russell Ghent, of Leatherwood Walker Todd & Mann, of Greenville, for Respondent–Petitioner.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, and Assistant Attorney General S. Creighton Waters, all of Columbia, for Petitioner–Respondent.

Chief Justice TOAL:

Respondent–Petitioner Keith Lasean Simpson (Simpson) was found guilty of murder and received a death sentence. Simpson appealed and this Court affirmed. *State v. Simpson*, 325 S.C. 37, 479 S.E.2d 57 (1996). Simpson filed for post-conviction relief (PCR). The PCR court denied relief on all issues related to guilt but granted relief on sentencing. We affirm in part and reverse in part.

### FACTUAL/PROCEDURAL BACKGROUND

Simpson and his accomplice planned to rob a convenience store. Armed with guns, the two men went to a store owned by Joe Harrison. Once there, Simpson went inside the store while his accomplice waited in the parking lot. At the same time, a customer entered the store with his nine-year-old son, Nathan. After making his purchase, the customer went outside to wait for Nathan. Joe Harrison was behind the counter, working the register.

Suddenly, gunshots were fired. A store employee, who was in the back of the store, testified that he saw Harrison walking towards the front door while Simpson shot at Harrison from behind. Nathan testified that he walked towards the front of the store to see what had happened. According to Nathan, Simpson pointed the gun at Nathan's forehead and attempted to fire the gun, but it only made a clicking noise. After this encounter with Simpson, Nathan ran and hid behind a poker machine. Nathan testified that while he was hiding, he saw Simpson go behind the counter and take money from the cash register.

Once the shooting began inside, Simpson's accomplice shot Nathan's father, Tony Scott, outside, in the parking lot. Scott was injured, and Harrison, the owner, died. Simpson and his accomplice fled the scene, pointing their guns and shooting at others in the area, but injuring no one else.

Simpson was indicted for murder, armed robbery, assault and battery with intent to kill, possession of a firearm during commission of a violent crime, and five counts of pointing a firearm.

At trial, Simpson gave a different version of events. He testified that once inside the store, he "chickened out." He claimed that he lifted his shirt, exposing the gun, as a way of signaling to his accomplice that he no longer wanted to rob the store. When Simpson lifted his shirt, Harrison saw the gun, grabbed Simpson by the shirt collar, and the two began to struggle. During the alleged struggle, two shots went off, Harrison began to stagger, and then Simpson fired two additional shots at Harrison. In addition, Simpson testified that he did not take anything from the store when he left.

The jury found Simpson guilty of murder and he was sentenced to death. He was also sentenced to serve consecutive sentences of thirty years for armed robbery, twenty years for assault, and five years for each of the pointing-a-firearm charges. Simpson appealed and this Court affirmed. *State v. Simpson*, 325 S.C. 37, 479 S.E.2d 57 (1996). Simpson filed for post-conviction relief (PCR), and following a hearing, Simpson was denied relief on guilt but granted relief on sentencing. We granted Simpson's and the State's petitions for certiorari.

Simpson raises the following issues for review:

I. Did the PCR court err in finding counsel was not ineffective for failing to consult an independent forensic pathologist, medical examiner, or homicide-reconstruction expert?

II. Did the PCR court err by denying Simpson relief due to the State's failure to disclose potentially exculpatory evidence related to the armed-robbery charge?

III. Did the PCR court err in finding the State did not engage in prosecutorial misconduct?

IV. Did the PCR court err in finding counsel was not ineffective for failing to call an expert witness to discredit a child witness's testimony?

V. Did the PCR court err in finding counsel was not ineffective for failing to object to the State's use of peremptory challenges against women?

VI. Did the PCR court err in failing to conduct a cumulative-error analysis?

The State raises the following issues for review:

I. Did the PCR court err in finding Simpson was prejudiced by counsel's failure to fully develop Simpson's mitigation case?

II. Did the PCR court err by considering numerous depositions and affidavits in lieu of live testimony?

## Law/Analysis

### Standard of Review

■ This Court gives great deference to the PCR court's findings of fact and conclusions of law. *Caprood v. State,* 338 S.C. 103, 109, 525 S.E.2d 514, 517 (2000) (citing *McCray v. State,* 317 S.C. 557, 455 S.E.2d 686 (1995)). On review, a PCR judge's findings will be upheld if there is any evidence of probative value sufficient to support them. *Cherry v. State,* 300 S.C. 115, 119, 386 S.E.2d 624, 626 (1989). If no probative evidence exists to support the findings, this Court will reverse. *Pierce v. State,* 338 S.C. 139, 144, 526 S.E.2d 222, 225 (2000) (citing *Holland v. State,* 322 S.C. 111, 470 S.E.2d 378 (1996)).

■ To establish a claim that counsel was ineffective, a PCR applicant must show that (1) counsel's representation fell

below an objective standard of reasonableness and (2) but for counsel's errors, there is a reasonable probability that the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Johnson v. State*, 325 S.C. 182, 186, 480 S.E.2d 733, 735 (1997). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

## DISCUSSION

### ISSUES RAISED BY SIMPSON

### I. Failure to Consult a Forensic Expert

■ Simpson contends that the PCR court erred in finding counsel was not ineffective for failing to consult an independent forensic pathologist, a medical examiner, or a homicide-reconstruction expert. We disagree.

At trial, the State presented the expert testimony of Dr. Wren, the pathologist who performed Harrison's autopsy. Dr. Wren testified that Harrison was shot three times: once through the hand, once through the front abdomen, and once through the back. Dr. Wren stated that all three were distant gunshot wounds, meaning that when fired, the gun was at least twelve inches from the victim.

Defense counsel did not call an expert to rebut Dr. Wren's testimony. Instead, the defense presented Simpson as its sole witness. Simpson testified that the shooting occurred during a struggle over the gun. During closing argument, defense counsel reenacted Simpson's testimony, showing the jury three possible theories regarding the trajectory of the bullets.

At the PCR hearing, defense counsel testified that he did not see a need for calling an expert witness to refute Dr. Wren's testimony. But to show that there was in fact a need for such testimony, PCR counsel called three expert witnesses to the stand. Two of the experts testified that Harrison was shot in the hand while he was gripping the barrel of Simpson's gun, which supported Simpson's testimony that the shots were fired during a struggle. But one expert testified that Harrison could have been shot in the back while lying on the ground

or he could have been shot in the back while standing upright and fleeing.

After considering this testimony, the PCR court found that defense counsel was not deficient in failing to consult an expert. The court viewed the allegations against counsel as relating less with trial strategy and more to the degree that counsel should go in pursuing a defense theory. In addition, the court found that even if counsel was deficient, there was no prejudice. The judge found that the expert testimony presented at the PCR hearing added little either factually or theoretically, and did not negate the fact that all of the elements necessary for a murder conviction were present. Therefore, the PCR court found that there was not a reasonable probability the added testimony would have changed the outcome of the guilt phase of the trial.

▆▆▆ "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). A decision "not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* When counsel's performance falls below this standard, a "defendant must show that there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

▆▆▆ We agree with the PCR court and find that counsel was not deficient in failing to consult a forensic expert. It is clear from the record that counsel's primary strategy was to prove that the shooting occurred during a struggle, and that this struggle somehow negated or lessened Simpson's criminal liability for Harrison's death. However, evidence that Harrison grabbed Simpson by the shirt collar does nothing to explain how and why the gun was pulled from Simpson's waist. Additionally, Simpson himself testified to intentionally shooting a wounded Harrison *twice* after the alleged struggle concluded, once in Harrison's *back*. Even if Simpson's testimony about the struggle was corroborated with expert testi-

mony, there is not a reasonable probability that the jury would not have found Simpson guilty of murder.[1]

■ Accordingly, we hold that the PCR court properly held that counsel was not ineffective in failing to consult an independent forensic pathologist, a medical examiner, or a homicide-reconstruction expert.[2]

## II. Brady Violation

Simpson contends that the PCR court erred in denying relief due to the State's failure to disclose potentially exculpatory evidence related to the armed-robbery charge. We agree.

The armed-robbery charge served as an aggravating circumstance that allowed the State to seek the death penalty. *See* S.C.Code Ann. § 16–3–20 (1976). Accordingly, it was essential for the State to prove that Simpson actually robbed the store.

When police arrived at the scene of the crime, they noticed that the cash register drawer was open, and there were bills in every slot except the slot that would normally contain twenty-dollar bills. Police also found a bag of money behind the counter, near the register. Instead of preserving the bag and

1. It is these facts, which remained uncontested in the PCR hearing, that compel our finding that counsel was not deficient. Although there is no doubt that some particulars of the crime are in dispute, there can be no doubt about Simpson's malicious conduct which amounted to gunning down a wounded crime victim and attempting to execute the witnesses. We further find that Simpson was erroneously given a voluntary manslaughter charge at trial. Given Simpson's admission to firing on Harrison multiple times after the alleged struggle, under no circumstance could we conclude that Simpson acted without malice or had sufficient legal provocation to use deadly force.

2. In a PCR proceeding, Simpson may not simply posit suppositions and speculations in an attempt to establish that counsel was ineffective. Judicial scrutiny of counsel's performance is highly deferential and the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *Butler v. State*, 286 S.C. 441, 445, 334 S.E.2d 813, 816 (1985) (citing *Strickland*, 466 U.S. at 668, 104 S.Ct. 2052). Though hindsight may provide a different view of counsel's actions, Simpson is not entitled to a new trial for the sole purpose of presenting a "fancier" case. *Jones v. State*, 332 S.C. 329, 339, 504 S.E.2d 822, 827 (1998).

disclosing its existence to Simpson's counsel, the police gave the bag to the victim's brother, Jack Harrison, who helped run the store.

The PCR court found:

The turning over of the bag by law enforcement clearly constitutes sloppy police work in an armed robbery investigation and could be considered a tainting of the scene. Clearly the contents of the bag could have been exculpatory. Clearly this evidence should have been preserved and, thus, been subject to discovery by [Simpson].

Despite this finding, the court ruled that the issue about the bag of money was not preserved for review because Simpson did not specifically raise it in his PCR application. We disagree.

At the PCR hearing, two witnesses were called to testify about the money issue. The first witness was Simpson's defense counsel, who testified that he learned about the bag of money only two hours before testifying. The second witness was Jack Harrison, whom the State called for the specific purpose of addressing the money issue. Jack testified that the money was used to cash customers' checks, and it was unusual for money to be taken from the register and put into the bag.

Given this testimony and the PCR court's ruling on the issue relating to the bag of money, we hold that Simpson should have been permitted to amend his PCR application to conform to the evidence presented. *See* Rule 15(b), SCRCP (pleadings may be amended, even after judgment, to conform to issues tried by express or implied consent but not raised in the original pleadings); *Arnold v. State,* 309 S.C. 157, 172, 420 S.E.2d 834, 843 (1992) (amendments must conform to evidence presented at trial, not raise new claims). Moreover, we hold that the State would not be prejudiced by such an amendment given that the State cross-examined Simpson's defense counsel on the issue and was permitted to present its own witness, Jack Harrison, to contest the issue's relevance. *See Harvey v. Strickland,* 350 S.C. 303, 313, 566 S.E.2d 529, 535 (2002) (amendments should be liberally allowed when no prejudice to the opposing party will result).

 Turning to the merits, we hold that the State's failure to tell the defense that a bag of money was found behind the counter prejudiced Simpson's case in the penalty phase. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. State of Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). A *Brady* claim is complete if the accused can demonstrate (1) the evidence was favorable to the accused, (2) it was in the possession of or known to the prosecution, (3) it was suppressed by the prosecution, and (4) it was material to guilt or punishment. *Sheppard v. State*, 357 S.C. 646, 659, 594 S.E.2d 462, 470 (2004). Favorable evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* at 660, 594 S.E.2d at 470.

 Armed robbery was both a charge against Simpson in its own right and a statutory aggravating circumstance urged by the State as a ground for imposing the death penalty. There is a reasonable probability that Simpson would not have been found guilty of armed robbery had the evidence about the bag of money been disclosed.[3] Moreover, because the State needed to prove that a robbery occurred in order to seek the death penalty, there is a reasonable probability that Simpson would not have received a sentence of death had the State failed to prove Simpson robbed the store.

Therefore, we hold that the PCR court erred in denying relief on this basis. Accordingly, Simpson is entitled to a new trial on the armed robbery charge.

---

3. There was also a memo to the file written by one of the solicitors identifying possible weaknesses in the case, including the fact that "no robbery (larceny) occurred" and "[t]here was nothing taken from the store ... only an attempted robbery occurred." But the PCR court did not consider whether the State's failure to disclose this memo constituted a *Brady* violation nor did PCR counsel raise the issue in the Rule 59(e), SCRCP, motion to alter or amend. Therefore, the issue is not preserved for review. *See Noisette v. Ismail*, 304 S.C. 56, 58, 403 S.E.2d 122, 124 (1991).

## III. Prosecutorial Misconduct

█ Simpson contends that the PCR court erred in finding that the State did not engage in prosecutorial misconduct in its alleged coaching of the child witness, Nathan. We disagree.

█ A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's judgment. *U.S. v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The knowing use of perjured testimony is subject to the materiality standard of review: "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682, 105 S.Ct. 3375.

At trial, Detective Rick Gregory testified that he interviewed nine-year-old Nathan Scott the day after the shooting. During their conversation, which Gregory did not record, Nathan told Gregory that he saw a black man go behind the counter and take money out of the cash register. But twelve days later, Gregory obtained a written statement from Nathan in which Nathan mentioned only that he saw a black man go behind the cash register—not that he saw a man take money from the register.

At some point before trial, the State's investigator, Johnny Dyer, went to Nathan's home to discuss the crime. After talking at the house, Dyer took Nathan to the store so that Nathan could explain what he had witnessed and where he had hidden during the incident. Afterwards, Dyer sent a letter to defense counsel stating "Nathan Scott may testify that he saw the black man in the store, and the man had money in his hand that came from the cash register."

Simpson first contends that the State engineered and introduced materially false and misleading testimony regarding whether Nathan saw Simpson take money from the register. We disagree.

Although there is speculation that Dyer attempted to improperly influence Nathan, there is simply no evidence supporting a finding that such misconduct actually occurred. In fact, the State was uncertain as to how Nathan would testify.

In a letter to defense counsel, Dyer stated that Nathan *may* testify that he saw Simpson take money from the register. And later, at the PCR hearing, defense counsel explained that he did not call Dyer to testify because counsel was uncertain as to whether Dyer had improperly coached Nathan.

Moreover, there is no evidence to support a finding that Nathan's testimony was false. Defense counsel was aware that Nathan's story had changed throughout the investigation and cross-examined him accordingly. The jury heard this testimony and was able to evaluate Nathan's credibility based on these inconsistencies.

■ Simpson also contends that, by not telling defense counsel about the meeting with Nathan at home and at the store, the State withheld exculpatory and impeaching evidence in violation of *Brady.* We disagree. Simpson was unable to show that there was a reasonable probability that the result of the trial would have been different had the defense known about the meeting. Therefore, we find that the State did not violate *Brady. See Sheppard,* 357 S.C. at 660, 594 S.E.2d at 470 (withheld evidence must be material to guilt or punishment).

Accordingly, we hold that the PCR court properly found that the State did not engage in prosecutorial conduct.

## IV. Expert Witness

■ Simpson contends that the PCR court erred in finding counsel was not ineffective for failing to call an expert witness to discredit Nathan's testimony. We disagree.

At the PCR hearing, defense counsel testified that he did not think that he needed to call an expert witness to discredit Nathan's testimony. After learning that Nathan's recollection of events had changed, counsel decided that the issue could be addressed on cross-examination, and counsel was in fact able to get Nathan to admit on cross that someone from the solicitor's office "helped" him remember that he saw "a black man taking money out of the cash register." Given this admission, counsel concluded that cross-examination "went very well," and therefore there was no need to consult any sort of expert to discredit Nathan's testimony.

In response, Simpson presented expert testimony at the PCR hearing from a developmental psychologist who identi-

fied a number of factors—including Nathan's low I.Q., his young age, and the length of time between when the crime occurred and when Nathan was interviewed by investigators—indicating that Nathan would likely remember false details about the shooting.

The PCR court found that counsel "ably, adequately and thoroughly addressed the false memory/suggestion issue at the source, Nathan Scott." In addition, the court found that the cross-examination of Nathan "clearly exposed his lack of accurate recall and not only his susceptibility to suggestion, but the actual enhancement of his recall by statements to him by others, namely individuals at the Solicitor's office." We agree.

On both direct and cross, Nathan's lack of accurate recall was exposed to the jury. At the PCR hearing, defense counsel explained that he knew Nathan's story had changed, and that he had planned to address this issue on cross-examination. Therefore, we find that counsel was not deficient in failing to call an expert witness to discredit Nathan's testimony. *See Ingle v. State*, 348 S.C. 467, 470, 560 S.E.2d 401, 402 (2002) (counsel may avoid a finding of deficiency if he articulates a valid reason for using a certain strategy).[4]

## V. Voir Dire

■ Simpson contends that the PCR court erred in finding counsel was not ineffective for failing to object to the State's use of peremptory challenges against women. We disagree.

---

4. The dissent finds that counsel was deficient in failing to consult and present an expert discrediting Nathan's testimony. Again, this conclusion is somewhat confounding given that the PCR court's decisions are reviewed under the "any evidence" standard and there appears to be ample evidence supporting the PCR court's finding. Second, assuming that counsel was deficient, the dissent presents two statements made by jurors citing their doubts as to the credibility of Nathan's testimony. While the dissent finds this is evidence of prejudice, we see this as evidence of a lack of prejudice. The jury in this case returned a unanimous conviction on the armed robbery charge; therefore, it is completely reasonable to assume that any jurors having doubts about Nathan's testimony relied on other evidence in finding Simpson guilty beyond a reasonable doubt. We further note that Nathan's testimony was only relevant to the charge of armed robbery, and Nathan will inevitably have to testify again since we are reversing the armed robbery conviction under *Brady*. Nathan's testimony was not at all relevant to, and had no impact on, Simpson's murder conviction.

In making this contention, Simpson does not argue that the jury was incompetent or impartial. Instead, Simpson argues that counsel was unaware of the then recent decision of *J.E.B. v. Alabama ex rel T.B.*, 511 U.S. 127, 143, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), in which the United States Supreme Court held that the gender-based exercise of peremptory challenges violates the equal protection clause of the Constitution.

At the PCR hearing, defense counsel testified that he did not recall considering the possibility of objecting to the State's use of peremptory strikes on the basis that they were gender-based. The PCR court ruled that counsel's failure to challenge the State's strikes on the basis of gender was consistent with objective standards of reasonableness and not prejudicial to the outcome of Simpson's trial. We agree.

Simpson did not present any evidence that potential jurors were struck simply on the basis of their gender. In addition, Simpson failed to show that he was prejudiced by the jury selected. *See Palacio v. State*, 333 S.C. 506, 517, 511 S.E.2d 62, 68 (1999) ("a criminal defendant has no right to a trial by any particular jury, but only a right to a trial by a competent and impartial jury"). Therefore, we hold that the PCR court properly denied relief on this basis.

## VI. Cumulative–Error Analysis

Simpson contends that the PCR court erred in failing to conduct a cumulative-error analysis. We disagree.

When counsel's deficiency is so pervasive as to render a particularized prejudice inquiry unnecessary, a defendant may be relieved of his burden to show prejudice. *Green v. State*, 351 S.C. 184, 196, 569 S.E.2d 318, 324 (2002). Whether several errors, which are independently found not to be prejudicial, may cumulatively warrant relief is an unsettled question in South Carolina. *Id.* at 197, 569 S.E.2d at 324–25.

Because the PCR court found that only one of Simpson's allegations had merit, there was no need to conduct a cumulative-error analysis. The record simply did not contain "several errors" for the judge to cumulatively assess. We hold, therefore, that the PCR court did not err in failing to conduct such an analysis.

ISSUES RAISED BY THE STATE

## I. Mitigation Case

■ The State argues that the PCR court erred in finding that Simpson was prejudiced by counsel's failure to offer sufficient social history evidence in the mitigation case. We agree.

The United States Supreme Court has held that counsel's failure to conduct a reasonable investigation into mitigating circumstances constitutes ineffective assistance. *Wiggins v. Smith*, 539 U.S. 510, 511, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In *Wiggins*, the Court found that counsel's review of a pre-sentence investigation report and records from the Department of Social Services records did not constitute a reasonable investigation into defendant's background. *Id.* A more in-depth investigation would have revealed the defendant's "severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother," the "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," the time he spent homeless, and his diminished mental capacity. *Id.* at 535, 123 S.Ct. 2527. Instead, only one significant mitigating factor—Wiggins's lack of a criminal history—was before the jury. *Id.*

Similarly, this Court has found counsel ineffective for failing to adequately investigate and prepare expert testimony about a defendant's mental condition. *Von Dohlen v. State*, 360 S.C. 598, 602 S.E.2d 738 (2004). In *Von Dohlen*, a psychiatrist testified at trial that the defendant suffered from "adjustment reaction disorder," as well as pathological intoxication from the abuse of alcohol and Valium. *Id.* at 604, 602 S.E.2d at 741. He also testified that the defendant did not have a chronic mental illness and did not dispute the solicitor's assertion that defendant's disorder was "pretty small potatoes." *Id.* But later, at the PCR hearing, the psychiatrist testified that, had he been provided with additional medical records that existed and were available at trial, he would have diagnosed defendant as suffering from "major depressive episodes with severe symptoms of anxiety and possible psychotic feature," in addition to alcohol and Valium abuse. *Id.* at 604–05, 602 S.E.2d at 741. The Court held that "[t]he absence of crucial medical records and related information which existed at the time of

[the defendant's] trial prevented [the psychiatrist] from conveying an accurate diagnosis and explanation of [the defendant's] mental condition...." *Id.* at 608, 602 S.E.2d at 743.

At trial in the present case, defense counsel called several witnesses, including three experts, to offer mitigating evidence in the sentencing phase. Witnesses testified that Simpson's mother used heroin while pregnant with him, Simpson grew up in a drug environment, he had trouble in school, and he experienced several personal tragedies. One expert, a clinical social worker, testified that Simpson's mother abused drugs while pregnant with Simpson and after, Simpson was often abandoned as a child, he suffered chronic headaches, and had been exposed to traumatic life events. A second expert, a clinical psychologist, testified that Simpson's IQ was at the lower end of the normal range, and that Simpson tested "highly abnormal" on the scales of paranoia, schizophrenia, and mania. Finally, a forensic psychiatrist, Dr. Dupree, testified that Simpson suffered from a mental illness known as dysthymic disorder, which is basically chronic depression that lasts over a period of more than two years. Dr. Dupree also testified that Simpson experienced symptoms associated with attention deficit disorder and post-traumatic stress disorder, but he could not be diagnosed as having these disorders. She also noted his history of drug and alcohol abuse.

But at the PCR hearing, Simpson's counsel presented the testimony of two experts, who gave a more detailed explanation of the relationship between Simpson's traumatic childhood and the likelihood that he would murder someone. PCR counsel also submitted the affidavit of Dr. Dupree, in which she stated that the opinion she gave at the sentencing hearing was not reliable because she did not know that Simpson's mother had used drugs during her pregnancy with Simpson; that Simpson had been sexually abused; that he had witnessed and experienced several acts of violence; and that he had suffered chronic headaches. Based on this "new" information, Dr. Dupree stated she was prepared to testify that neglected and abandoned children are prone to depression, anxiety disorders, substance abuse disorders, and other psychiatric illnesses, and that people who are exposed to traumatic events are more likely to suffer from PTSD.

Based on this evidence, the PCR court found that counsel failed to fully investigate Simpson's medical, mental, social, and familial history, and because of this, the jury did not have the opportunity to consider mitigating factors warranting a life sentence as opposed to the death penalty. We disagree.

Simpson's defense counsel interviewed a number of witnesses about Simpson's childhood and life. Counsel also hired a private investigator to go to New York and gather background information on Simpson. Moreover, counsel called several witnesses, including three experts, to offer mitigating evidence. Counsel testified that information gathered about Simpson's background was available to the experts. Therefore, we find that the PCR judge erred in finding counsel deficient.

■ Even if the PCR judge correctly found counsel deficient, Simpson failed to show that he was prejudiced during the mitigation case. The jury was aware of Simpson's troubled childhood, traumatic life experiences, and mental condition. Any additional investigation would have merely resulted in a "fancier" mitigation case, having no effect on the outcome of the trial. *See Jones v. State,* 332 S.C. 329, 504 S.E.2d 822 (1998) (holding that a "fancier mitigation case" does not render the prior case inadequate).

Therefore, the PCR court erred in finding that Simpson was prejudiced by deficiencies in the mitigation case.

## II. Depositions and Affidavits

■ The State argues that the PCR court erred by considering numerous depositions and affidavits in lieu of live testimony. We disagree.

■ At a PCR evidentiary hearing, "[t]he court may receive proof by affidavits, depositions, oral testimony, or other evidence...." S.C.Code Ann. § 17–27–80 (1985). Whether to admit such evidence is within the court's discretion. *Beckett v. State,* 278 S.C. 223, 224, 294 S.E.2d 46, 47 (1982).

In the present case, the PCR court allowed Simpson to introduce over forty depositions and some twenty-two affidavits into evidence in lieu of live testimony. We find that this decision was within the trial judge's discretion, resulting in no

prejudice to the State. Most of the relevant witnesses testified at the PCR hearing and were cross-examined by the State. In addition, the court gave the State the opportunity to submit additional testimony and affidavits countering the evidence presented by Simpson. Therefore, we hold that the PCR court did not err.

## CONCLUSION

We affirm the PCR court's decision declining to grant a new trial as to the conviction of murder. As to the conviction of armed robbery, however, we reverse the PCR court's decision declining to grant relief, because we find that the State withheld potentially exculpatory evidence related to the armed robbery charge. Therefore, Simpson is entitled to a new trial on the armed robbery charge. If the State convicts Simpson of armed robbery on retrial, Simpson will also be entitled to a new trial on the penalty phase of the capital murder charge, given that armed robbery served as the sole aggravating circumstance allowing the State to seek the death penalty.[5]

We also reverse the PCR court's decision finding that the mitigation case was not fully developed. We find that defense

---

5. We fail to see how, as the dissent suggests, *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), in any way suggests that this form of relief is improper. *Ring* and its companion cases stand simply for the proposition that a sentence may not be enhanced by considering facts that have not been proved beyond a reasonable doubt. *Id.* at 602, 609, 122 S.Ct. 2428. In no way can these cases be read to provide that the remedy we grant here is constitutionally deficient.

We are equally unpersuaded that the case of *Oregon v. Guzek*, 336 Or. 424, 86 P.3d 1106 (2004) (scheduled for argument before the United States Supreme Court December 7, 2005), is at all relevant in this matter. *Guzek* deals with the limitations and requirements for mitigation evidence as provided by the due process clause of the Eighth Amendment to the United States Constitution. If Simpson were found guilty of armed robbery on re-trial, it is likely that any "residual doubt" about Simpson's guilt would simply be a collateral attack on the validity of his conviction. Under current Supreme Court jurisprudence, the Eighth Amendment "in no way mandates reconsideration by capital juries, in the sentencing phase, of their 'residual doubts' over a defendant's guilt ... [s]uch lingering doubts are not over any aspect of petitioner's 'character,' 'record,' or 'circumstance of the offense.'" *Franklin v. Lynaugh*, 487 U.S. 164, 174, 108 S.Ct. 2320, 2327, 101 L.Ed.2d 155 (1988). Until the Supreme Court directs otherwise, we will continue to apply what appears to be well-reasoned and well-settled precedent.

counsel presented a thorough mitigation case on Simpson's behalf.

Finally, we affirm the PCR court's decision to consider certain depositions and affidavits in lieu of live testimony.

Therefore, the PCR court's decision is affirmed in part and reversed in part.

MOORE, WALLER, and BURNETT, JJ., concur.

PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES, dissenting:

The majority holds the State's *Brady*[1] violation entitles Simpson to a new trial on the armed robbery charge, with capital resentencing contingent on the outcome of that trial. In my opinion, such a limited remedy would violate Simpson's constitutional rights.

In finding a *Brady* violation, we have necessarily found the nondisclosed evidence was material. In determining materiality for *Brady* purposes,

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.
>
> *Kyles v. Whitley*, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

I would hold that when, as here, the *Brady* violation in the guilt phase of a capital trial relates to the aggravating circumstances relied upon by the State in the penalty phase,[2] fundamental fairness requires a new trial.

I am also concerned that to deny Simpson a new sentencing proceeding under these circumstances would violate his Sixth Amendment right to trial by jury. In *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United

---

1. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

2. Murder during the commission of armed robbery, S.C.Code Ann. § 16–3–20(c)(a)(1)(d) (2003) and murder for the purpose of receiving money or any thing of value. § 16–3–20(c)(a)(4) (2003).

States Supreme Court held that this right entitles the capital defendant to "a jury determination of any fact on which the legislature conditions an increase in [his] maximum punishment." *Id.* at 589, 122 S.Ct. 2428. The original jury which sentenced Simpson to death was deprived, by the State's unconstitutional act, of hearing all of the evidence relevant to the aggravating factors. To deny Simpson the right to have his sentence determined by a jury which has heard all the facts, including those which exculpate him, would violate his Sixth Amendment right to a jury trial. *Ring v. Arizona, supra; cf. State v. Riddle,* 301 S.C. 68, 389 S.E.2d 665 (1990) (capital resentencing reversed where state permitted to prove statutory aggravators merely by introducing defendant's convictions for burglary and armed robbery from the first trial; these convictions were in no way binding on resentencing jury, which had to determine appropriate penalty from the evidence presented to it).

I therefore concur in the majority's determination that the State committed a *Brady* violation, but dissent from its holding that the error may be remedied by a retrial on the armed robbery charge alone with a contingent new sentencing proceeding. In any case, as explained below, I would hold that counsel were ineffective in failing to present expert testimony to impeach Nathan's credibility, and to dispute the State's forensic evidence.[3]

At trial, Nathan acknowledged that 'someone' had told him what to say, and agreed on cross-examination that the solicitor's office had "helped" him remember. At the PCR hearing, Simpson presented expert testimony that Nathan's low I.Q.[4]

---

**3.** I would also find that trial counsel were deficient in failing to be aware of *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), which was decided five months before the capital trial. *See Hill v. State,* 350 S.C. 465, 567 S.E.2d 847 (2002) (trial counsel rendered deficient performance in failing to be aware of three month old decision). I agree, however, that Simpson failed to demonstrate the requisite prejudice stemming from this deficient performance and thus did not meet his burden of proving this allegation ineffective assistance of counsel. *See Williams v. State,* 363 S.C. 341, 611 S.E.2d 232 (2005).

**4.** Nathan's full scale I.Q. was 71 while his performance I.Q. was 69, placing him in the lowest 3% of children in the United States.

and learning disability[5] made him especially susceptible to suggestions about past events, a situation compounded by his young age (nine at the time of the events). Simpson's expert pointed to specific parts of Nathan's testimony that were consistent with false memories. One of Simpson's trial attorneys admitted that while they were aware of the changes in Nathan's testimony, they felt they could deal with it through cross-examination. Simpson's lead counsel echoed this sentiment. Trial counsel did not consult with a memory expert.

The PCR judge found that the attorneys were fully aware before trial of Nathan's belated recollection of having seen Simpson with cash in hand, and was not ineffective in relying only on cross-examination to call Nathan's credibility into question. The majority upholds this ruling. I would reverse.

A PCR applicant claiming trial counsel was ineffective must establish both that counsel's performance was deficient, that is, that it fell below an objective standard of reasonableness, and that the deficient performance prejudiced the applicant's case, that is, but for counsel's deficient performance there is a reasonable probability that the outcome of the proceeding would have been different. *Williams v. State*, 363 S.C. 341, 611 S.E.2d 232 (2005); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). On certiorari, this Court will uphold the PCR judge's findings if they are supported by any probative evidence in the record. *Williams, supra.*

The PCR judge found counsel was not ineffective in relying solely on cross-examination to impeach Nathan's credibility. In support of this finding, the PCR judge referred to a juror's affidavit which stated:

> I was concerned about the testimony of the little boy who was in the store. I suspected that he might have some memory problems because I was not sure that I could rely on the boy's testimony about Mr. Simpson taking money out of the register and although I signed the verdict form in the end, I was never certain the [sic] Mr. Simpson really committed armed robbery.

---

5. His learning disability included an inability to recall the details of a story while grasping the main theme.

The majority affirms the PCR judge's denial of relief to Simpson on this ground, finding the decision to rely on cross-examination of Nathan was "a valid trial strategy." I disagree. Counsel were well aware of the weakness of the State's armed robbery case, and the letter sent shortly before trial alerted them that Nathan 'may' have suddenly remembered a crucial fact. Without exploring the issue of Nathan's background, trial counsel were not in a position to make a strategic decision. Had counsel conducted even a cursory review of Nathan's school records, they would have been aware of his low I.Q. and learning disability. Surely knowledge of these facts, combined with Nathan's critical new recollection, would have sufficient to put trial counsel on notice that Nathan's memory was suspect. In my opinion, counsel were deficient in failing to pursue the credibility of Nathan's recalled memory and in relying on cross-examination of a child witness/victim upon whose testimony the armed robbery case largely turned.

As Simpson demonstrated at the PCR hearing, expert testimony would have allowed the jury to understand the special vulnerability of Nathan to suggestions regarding the crucial events. In my opinion, Simpson produced evidence not only of deficient performance in counsels' reliance solely on cross-examination to impeach Nathan's testimony, but also of prejudice. One juror admitted she "suspected that [Nathan] might have some memory problems." While the PCR judge viewed this statement as evidence of counsel's adequate cross-examination performance, I find it is evidence of prejudice. In my opinion, there is a reasonable probability that expert testimony would have confirmed this juror's "suspicion" and resulted in Simpson's acquittal of armed robbery. A finding of 'not guilty' on the armed robbery charge would have negated both aggravators relied upon by the State.

Further, as explained below, if the jury were to find Nathan's story less credible, then the credibility of Simpson's explanation of the events is enhanced. A jury finding Simpson's story credible might return a manslaughter verdict.[6]

---

6. The trial judge charged the jury on voluntary manslaughter based on Simpson's testimony.

Simpson testified that he had decided to withdraw from the planned armed robbery, and that the first shots were fired as he and Harrison struggled over the gun. Simpson explained that he shot at Harrison as Harrison moved rapidly away from the cash register, presumably to use the phone to summon help, only in an attempt to disable him. In contrast, the State theorized that there was no struggle and no shots fired during such, and that Harrison was shot in the back while prostrate on the ground. The State presented testimony from a pathologist that Harrison's hand wound was 'distant,' and that Harrison had been lying on the ground when he was shot twice in the back.[7]

At trial, counsel relied solely on Simpson's testimony and counsel's own "reenactment" during closing argument to support Simpson's version of events.

At the PCR hearing, Simpson presented three forensic experts. All disputed the State's expert's trial testimony, and opined that the evidence was consistent with the first shots having been fired during a struggle. They testified that Harrison's hand wound was not distant, and that the other wounds indicated Harrison was shot while standing, not while prostrate as the pathologist had testified at trial.

The PCR judge agreed that Simpson's PCR experts supported Simpson's story, but held their evidence was merely cumulative to trial counsel's reenactment in closing argument. I disagree.

Counsel's closing argument is not evidence. *E.g., State v. Charping,* 333 S.C. 124, 508 S.E.2d 851 (1998). I would hold, therefore, that there is no evidence in the record to support the PCR judge's holding that trial counsel were not deficient in failing to present forensic evidence to support Simpson's version of events.

The PCR judge held that, in any case, Simpson could not establish prejudice in that there was no reasonable probability that the forensic evidence would have changed the result since the jury could still have returned a murder verdict even if a

---

7. I note this theory is in part contradicted by the store employee's testimony that he saw Simpson shoot Harrison as Harrison walked rapidly towards the store phone.

struggle preceded the upright shooting of Harrison. I disagree. Had the jury heard the expert evidence concerning false memories and found that no money was taken, and had it heard forensic evidence that supported Simpson's story of a struggle followed by the shooting of Harrison while he was running away, the jury may have found Simpson's story credible and returned a manslaughter verdict. While it is true Simpson entered the store intending to rob it, he claimed to have changed his mind once there. Further, Simpson's testimony indicated that Harrison lunged for the gun after seeing it in Simpson's waistband, which is one explanation "how and why the gun was initially pulled from Simpson's waistband." Finally, Simpson acknowledges shooting Harrison twice after the struggle ended, but claimed it was in a panicked attempt to stop Harrison from getting help. In my opinion, Simpson demonstrated both deficient performance and prejudice stemming from trial counsels' decision not to present expert testimony supporting Simpson's version of events.

## CONCLUSION

The State's *Brady* violation denied Simpson a fair trial. *Kyles v. Whitley, supra.* Further, Simpson demonstrated both deficient performance on the part of his trial attorneys and resulting prejudice from their failure to pursue and present expert testimony. I would reverse Simpson's murder and armed robbery convictions and sentences, and remand for a new trial.[8]

---

8. Even if the new jury were to convict Simpson of murder and armed robbery, it is conceivable that Simpson would be entitled to argue and/or have his sentencing jury charged on residual doubt. The United States Supreme Court has on its docket for December 7, 2005, *Oregon v. Guzek*, No. 04–928. The issue in *Guzek* is:

Does a capital defendant have a right under the Eighth and Fourteenth Amendments to the United States Constitution to offer evidence and argument in support of a residual-doubt claim—that is, that the jury in a penalty-phase proceeding should consider doubt about the defendant's guilt in deciding whether to impose the death penalty?

Even without a *Guzek* argument or charge, it is entirely possible that a weaker guilt case would result in a life sentence.